IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 1 2 2007

JAMES W. McCORMACK, CLERK
By:_____ DEP CLERK

UNITED STATES OF AMERICA )
ex rel. [UNDER SEAL] )
)
PLAINTIFF )
)
VS. )        Civil Action 4:04CV00989 WRW
)
)
[UNDER SEAL] )        **FILED UNDER SEAL**
)
DEFENDANTS )
)

## COMPLAINT IN INTERVENTION OF THE UNITED STATES

43

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION**

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA, *ex rel.* NORMAN RILLE and NEAL ROBERTS, ) | ) ) ) |
| Plaintiff, ) | Case No. 4-04 CV0000989WRW |
| vs. ) | **FILED UNDER SEAL** |
| ) | |
| ACCENTURE LLP, an Illinois limited liability partnership; ACCENTURE LTD., a Bermuda Corporation; AVANADE, INC., a Delaware Corporation; HEWLETT–PACKARD COMPANY, a Delaware Corporation; and MICROSOFT CORPORATION, a Washington Corporation, | **COMPLAINT IN INTERVENTION OF THE UNITED STATES** |
| ) | False Claims Act, 31 U.S.C. § 3729, *et seq*, 41 U.S.C. §§ 51-58 and Common Law Causes of Action |
| Defendants. ) | |

The United States of America, by its undersigned attorneys, having intervened in this

action, brings this civil action against Hewlett-Packard Company for treble damages and civil

penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, the Anti-Kickback Act, 41

U.S.C. §§ 51-58, and under common law theories of unjust enrichment, breach of contract, and

payment under mistake of fact, and alleges as follows:

### I. Jurisdiction and Venue

1.      This is an action by the United States against defendant Hewlett-Packard

Company (HP), pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq*., and the Anti-

1

Kickback Act, 41 U.S.C. §§ 51-58 (AKA), and at common law.

2.    The Court has jurisdiction over this matter pursuant to 31 U.S.C. §§ 3729-3732, and 28 U.S.C. §§ 1331, 1345, and 1355, and its general common law and equitable jurisdiction.

3.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1395, and 31 U.S.C. § 3732.

## II. The Parties

4.    The Plaintiff is the United States of America.

5.    Defendant HP is a Delaware corporation that is headquartered in Palo Alto, California. During the period between 1998 and the present (the "Relevant Time Period'), HP has been doing business in the State of Arkansas and throughout the United States, and more particularly within the geographical limits of the United States District Court, Eastern District of Arkansas. During the Relevant Time Period, HP and its predecessors (including Compaq Computer, with which it merged in 2002) and successors (directly or through subsidiaries, affiliates or assigns) have established Alliances, Alliance Teams, Alliance Partnerships, and/or Affiliate relationships for the purpose of consummating sales as a technology vendor to the United States Government.

6.    The False Claims Act, 31 U.S.C. § 3730(b) provides that private persons may file an action pursuant to 31 U.S.C. §§ 3729 *et seq.* for the private person and the United States Government against a person violating the Act. The private person initiating such an action is called a "relator."

7.    Relator Norman Rille is a citizen and resident of the State of California. Mr. Rille filed this action pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b)

2

on or about September 17, 2004.  On December 13, 2006, the Government intervened in Mr.
Rille's action.

       8.      Relator Neal A. Roberts is a citizen and resident of the State of Cailifornia.  Mr.
Roberts filed this action pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §
3730(b) on or about September 17, 2004.  On December 13, 2006, the Government intervened
in Mr. Roberts' action.

       9.      Relators have previously made a voluntary disclosure of the wrongdoing referred
to herein to the United States Government pursuant to 31 U.S.C. § 3730(e)(4)(B).  Relators'
Complaint, filed on or about September 17, 2004, made detailed allegations regarding the
Relators' direct and independent knowledge of Defendants' wrongdoing alleged herein, which
comprises their original source allegations.

### III.  Nature of Action

      10.      Over the last 10 years, the United States Government, along with its departments,
subdivisions, prime contractors, and management and operating contractors ("the United States
Government" or "Government"), has contracted for the design, development, manufacture and
implementation of all kinds and types of information technology systems ( IT Systems).  These
IT Systems include substantial quantities of computer hardware, software and maintenance.  In
seeking to acquire and implement these IT Systems, the United States Government enters into
contracts with consulting service companies, which purport to be skilled in contract execution,
developing, manufacturing, and/or converting and integrating government systems and/or
providing information technology services ("Systems Integration Consultants").  Such efforts for
the development, manufacture and/or conversion and implementation of these IT Systems also

requires the Government's procurement of substantial technology hardware, software, maintenance and technical services from various technology companies ("Technology Vendors") resulting in the Government's expenditure of millions of dollars. The Government contracts with these Technology Vendors directly, and also contracts indirectly through prime contracts with Systems Integration Consultants. Government spending on information technology services and products alone constitutes many millions of dollars annually since 1998.

11.     Technology Vendors send tens of thousands of solicited and unsolicited proposals to the Government yearly, seeking to capture some of these Government dollars. The Systems Integration Consultants, who are entrusted and retained to act as the Government's independent third party objective advisors, are to assist the Government in answering numerous questions about the appropriate technology solutions, including the amount, type and purchasing methods for necessary hardware and software systems and maintenance.

12.     In order to increase market share in Government work, and for the purpose of consummating sales to the United States Government, HP, which is a Government Technology Vendor, has established relationships, and routinely uses those relationships, in what have become known as "teams," "strategic alliances," "alliance teams," "channel relationships," "channel partners," "alliances," or "affiliates" ("Alliance(s)" or "Alliance Team(s)" or "Alliance Partnership(s).").

13.     The United States Government, alleges that during the Relevant Time Period, HP has exploited the trust the Government has reposed in HP to act with honesty and candor, to provide accurate, complete and current cost and/or pricing data and to act without conflicts of interest, and has wrongfully used its Alliance relationships to enrich itself.

4

14.     For example, HP has entered into agreements with its Alliance Partners wherein it pays Kickbacks, as defined below, to its Alliance Partners including, but not limited to, referral fees, influence(r) fees, systems integration compensation fees, reseller fees, commissions, free or discounted products and/or services, equity ownership, profit sharing, or other benefits ("Kickbacks" or "Kickback Scheme"). Such Kickbacks are provided by HP to its Alliance Partners in return for influencing and providing favorable treatment for HP on Government procurements so as to obtain contracts or subcontracts with the Government.

15.     As a result, millions of dollars of Kickbacks were sought, received, offered and paid between and among HP and its Alliance Partners in violation of the False Claims Act and other federal statutes and regulations. In furtherance of this activity, HP expressly or impliedly represented or certified to the Government that it complied with various Anti-Kickback statutes, organizational conflict of interest laws, and other acquisition regulations, when, in fact, HP had not and does not comply with such laws and regulations.

### IV.  HP's Contracts With The Government

16.     During the Relevant Time Period, HP entered into hundreds of contracts or subcontracts, as well as task orders under a General Services Administration (GSA) Multiple Award Schedule (MAS) contract numbered GS-35F-4663G with the United States Government, under the terms of which, and/or by virtue of law or regulation required HP to comply with the False Claims Act, Anti-Kickback statutes, Truth in Negotiations Act (TINA), 10 U.S.C. §2036a and 41 U.S.C. §254b, organizational conflict of interest laws and other Federal Acquisition regulations (FARs). Those laws and regulations provide, in part, as follows:

a.      **The False Claims Act.** The False Claims Act provides that:

5

(a) Any person who–

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;

* * *

is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000], plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

(b) Knowing and knowingly defined. For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information --

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

b.      **The Anti-Kickback Act**. The Anti-Kickback Act of 1986, 41 U.S.C.

§52(2)(AKA), imposes liability on any person who makes a payment to any other person

involved in the federal procurement process for the purpose of obtaining favorable treatment.

The AKA defines the term "kickback" as follows:

(2) The term "kickback" means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or

6

> indirectly, to any prime contractor, prime contractor
> employee, subcontractor, or subcontractor employee for the
> purpose of improperly obtaining or rewarding favorable
> treatment in connection with a prime contract or in
> connection with a subcontract relating to a prime contract.

The Anti-Kickback Act of 1986, 41 U.S.C. §53, further provides that "[i]t is prohibited for any

person–

> (1) to provide, attempt to provide, or offer to provide any
> kickback;
>
> (2) to solicit, accept, or attempt to accept any kickback; or
>
> (3) to include, directly or indirectly, the amount of any
> kickback prohibited by clause (1) or (2) in the contract
> price charged by a subcontractor to a prime contractor or a
> higher tier subcontractor or in the contract price charged by
> a prime contractor to the United States.

    c.    **Organizational Conflicts of Interest.**  48 C.F.R. 9.505, provides, among other
things, that:

> The general rules in 9.505-1 through 9.505-4 prescribe limitations
> on contracting as the means of avoiding, neutralizing, or mitigating
> organizational conflicts of interest that might otherwise exist in the
> stated situations . . . Each individual contracting situation should
> be examined on the basis of its particular facts and the nature of
> the proposed contract. The exercise of common sense, good
> judgment, and sound discretion is required in both the decision on
> whether a significant potential conflict exists and, if it does, the
> development of an appropriate means for resolving it. The two
> underlying principles are—
>
> (a) Preventing the existence of conflicting roles that might bias a
> contractor's judgment; and
>
> (b) Preventing unfair competitive advantage. In addition to the
> other situations described in this subpart, an unfair competitive
> advantage exists where a contractor competing for award of any
> Federal contract possesses—

7

> (1) Proprietary information that was obtained from a Government official without proper authorization; or
>
> (2) Source selection information (as defined in 2.101) that is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract.

17.     Additionally, HP's MAS contract with the GSA requires HP to disclose its commercial pricing policies and practices as a prerequisite to getting an MAS Contract and in exchange for an opportunity to gain access to the broad federal marketplace and the ease of administration that comes from selling to hundreds of Government end users under one central contract.

18.     GSA regulations require that vendors or "offerors" seeking an MAS contract provide their commercial pricing policies and practices to GSA during negotiations. 48 C.F.R. § 515.408 (MAS Requests for Information); 48 C.F.R. § 515.408, Figure 515-4 (Instructions for the Commercial Sales Practices Format (CSPF)); 48 C.F.R. § 552.212-70 (Preparation of Offer – MAS). GSA also requires offerors to disclose if they deviate from their standard written pricing policies, and to include a discussion of the frequency and nature of those deviations. 48 C.F.R. § 515-408(b); 48 C.F.R. § 515.408, Figure 515-4, Column 5. GSA requires offerors to provide pricing information that is current, accurate and complete. 48 C.F.R. § 515.408, Figure 515-4.

19.     GSA requires these disclosures so that it has sufficient information to negotiate favorable terms for government purchasers. GSA aims to obtain "Most Favored Customer" status for individual government purchasers, which means that GSA is entitled to obtain prices comparable to a vendor's best to its most favored customers making similar purchases. 48 C.F.R. § 538.270.

8

20.     GSA and its contracting officers (COs) have a fiduciary responsibility to the taxpayers and to customer agencies to take full advantage of the Federal Government's leverage in the market in order to obtain the best prices.  62 Fed. Reg. 162, 44519.

21.     GSA expects government purchasers who order through the MAS Program to receive discounts that reflect the negotiating weight of the aggregate of government business, rather than the smaller expected purchases of the individual agency.

22.     MAS contracts include a clause which entitles the United States to seek a refund of overpayments in cases where the Technology Vendor did not provide current, accurate, and complete pricing data during negotiations that resulted in an inflated GSA price.  Price Adjustment – Failure to Provide Accurate Information, 48 C.F.R. § 552.215-72; Price Reduction for Defective Pricing Clause, 48 C.F.R. § 52.215-22.

## V.  HP's Alliances

23.     Defendant HP is a major Technology Vendor to the United States Government and sells millions of dollars annually to the United States Government of hardware, software, maintenance, and technical services.  In order to increase market share in Government work, Defendant HP has established alliances with Alliance Partners, in part, for the purpose of consummating sales to the United States Government.

24.     HP refers to these alliance agreement partners, simply as Partners.  HP has numerous Partner Agreements with its HP Authorized Resellers, System Integrators, Independent Software Vendors, Consultant and Integration Partners, and Business Application and Solution Partners.

25.     HP's Alliances were created to increase the profits of HP and its Alliance

9

Partners. HP made it clear in its Partner programs that the Partners that deliver the greatest value
to HP will "reap the greatest rewards from the program."

26.    During the Relevant Time Period, HP has had various Partner benefit programs in
place. HP's merger partner, Compaq, also had Alliance Partner Programs in place.

27.    In or around, November 2002, HP implemented its current Alliancre Partner
benefit program, PartnerONE. The PartnerONE Program unified HP's management of its'
relationships with its Partners. PartnerONE provided the Partners with various tools to help
generate new business, reach new customers, control business costs, increase profitability and
"triumph over competition." The PartnerONE Program led to the execution of numerous
Business Development Partner (BDP) Agreements with HP Partners.

28.    HP Partners have been critical to the financial success of HP because of their
ability to drive the demand for HP products and services in the Government end user.

29.    During Relevant Time Period, HP and its merger partner Compaq had BDP
Agreements, and predecessor agreements, with various Partners including the following:

Accenture, LTD.

BearingPoint Technology Procurement Services, LLC.

Computer Sciences Corporation

Electronic Data Systems

GTSI Corporation

International Business Machines Corporation

KPMG Enterprise Integration Services, LLC.

Lockheed Martin

10

Northrop Grumman

Cap Gemini

Raytheon Company

Science Application International Corporation

### VI. HP's Payment of Alliance Benefits

30.    In order to increase its federal business and obtain favorable treatment on Government contracts, HP paid its Alliance Partners a variety of Alliance Benefits.

**Influencer Fees**

31.    In some instances during Relevant Time Period, HP paid its Alliance Partners fees for influencing the Government's selection and purchase of HP product and services directly from HP.  These payments are called "influencer fees," and are payable under HP's predecessor System Integrator Agreements, as well as HP's PartnerONE BDPs.  Influencer fees were also paid by HP's merger partner, Compaq, under Compaq's partner agreements such as the Compaq Global CSI Referral Pilot Program Agreement with EDS, dated February 2002.

32.    Influencer fees are paid for successfully persuading and then referring Government end users to purchase products directly from HP.

33.    Influencer fees were paid by HP to its Alliance Partners for favorable treatment in the procurement process and for the purpose of, and in return for, the Alliance Partners' successfully influencing Government end users to purchase HP products and services.

34.    HP would only pay influence fees if the Alliance Partner was successful in influencing the purchase of HP product directly by the Government agency with HP. Additionally, HP required Partners to submit claim forms to receive influence fees for certain

11

products.

35.     For example, on August 27, 2003, HP's Alliance Partner, Accenture, submitted a request for compensation to HP for influence and favorable treatment resulting in the sale of HP product directly by HP to the Defense Logistics Agency (DLA). The HP representatives on the deal were Frances Smithson and Cliff Koch. Similarly, Robert Strelser of GTSI submitted Deal Registration D03595 in 2005 seeking influencer fees for getting the Department of the Army to choose HP over Dell and/or Sun hardware that was being considered .

36.     As a result of its Alliance Partners' influence for which HP paid influencer fees, HP was awarded prime contracts with the United States Government. The Government contracts under which HP would sell its products and services to the Government, including its own MAS Contract and the MAS Contracts of its authorized GSA Resellers, were governed by clauses that required strict compliance with the AKA and were subject to the requirements of the AKA.

37.     The AKA prohibits the fees that HP paid to its Partners that were made in order to influence the award of a contract and/or obtain favorable treatment in the federal procurement process.

38.     During the Relevant Time Period, HP knowingly paid influencer fees to its Alliance Partners in return for successful influence and favorable treatment in the procurement process on products and services to the Government.

39.     For example, HP paid the following influencer fees to Accenture as a result of Accenture's favorable treatment and influence for HP on Government Contracts:

    2004     $611,969

    2005     $175,623

12

40.    HP paid the following influencer fees to BearingPoint as a result of

BearingPoint's favorable treatment and influence for HP on Government Contracts:

    2004    $32,753

    2005    $34,792

41.    HP paid the following influencer fees to Capgemini Ernst & Young (Capgemini)

as a result of Capgemini's favorable treatment and influence for HP on Government Contracts:

    2004    $175,121

    2005    $599,962

42.    HP paid the following influencer fees to Electronic Data Systems (EDS) as a

result of EDS' favorable treatment and influence for HP on Government Contracts:

    2001    $10,262

43.    HP paid the following influencer fees to GTSI as a result of GTSI's favorable

treatment and influence for HP on Government Contracts:

    2001    $53,118

    2002    $194,117

    2003    $31,897

    2004    $514,238

    2005    $450,877

44.    HP paid the following influencer fees to Northrop Grumman (NG) as a result of

NG's favorable treatment and influence for HP on Government Contracts:

    2003    $40,922

    2004    $105,236

13

45.     HP paid the following influencer fees to Science Application International Corporation (SAIC) as a result of SAIC's favorable treatment and influence for HP on Government Contracts:

2005   $25,972

46.     Additionally, HP paid Unisys the following influencer fees in return for Unisys' favorable treatment and influence for HP on Government contracts:

2006   $10,037.

47.     HP has not disclosed to the Government the full extent of its influencer fee agreements and payments.

**New Business Opportunity Fees**

48.     In addition to its influencer fees, since 2003, HP provided its Alliance Partners with New Business Opportunity compensation (NBO) in return for influence and favorable treatment by its Alliance Partners on "resale transactions" with the Government.   Resale transactions are transactions in which HP's Alliance Partners would subcontract with HP for the purchase of HP products and services and then resell those HP products and services to the Government.

49.     NBO rebates were offered by HP to its alliance Partners to create new business for HP.  The intent of NBO was to compensate Alliance Partners for generating HP business with Government end users.

50.     The NBO was designed by HP to benefit HP and the Alliance Partner but not the end user.  HP specifically informed its Alliance Partners that HP did not extend competitive pricing to end users through the NBO.  Alliance Partners were directed to use use other HP devices,

14

such as "Big Deal Pricing", if they wished to extend price reductions to the end user. If price reductions were extended to the end user, HP would reduce the NBO accordingly.

51.    In order to qualify for NBO pricing, an HP Alliance Partner had to demonstrate that it had provided presales consulting services to the customer and influenced the sale such as recommending the HP product or providing systems integration consulting.

52.    For example, on September 25, 2006, HP paid NBO to Northrop Grumman Information Technology (NGIT) in the amount of $161,448 in connection with the Defense Medical Information Management Office. On January 14, 2005, HP paid NBO to NGIT in the amount of $123,177 for a Department of State contract. Additionally, on September 25, 2006, HP paid NBO to GTSI in the amount of $138,096 in connection with a contract with the Department of the Army at Fort Huachuca. On October 30, 2006 paid NBO to GTSI in the amount of $127,362 in connection with a contract for the FBI Terrorist Screening Center.

53.    HP's payment of influencer fees and NBO violates the False Claims Act in multiple ways. The cash benefits that HP paid to its Alliance partners pursuant to its Alliance Partner agreements to influence the award of Government prime contracts and subcontracts to HP, and obtain favorable treatment in the procurement process, are kickbacks in violation of the Anti-Kickback Act, 41 U.S.C. §53, 48 C.F.R. 3.502-2 and 48 C.F.R. 52.203.

54.    On numerous occasions, HP had reasonable grounds to believe that violations of the Anti-Kickback Act may have occurred, and yet failed to promptly report the possible violations in writing to the Inspector General of the applicable agency or other authorized person. These failures constituted further violations of the Anti-Kickback Act, 41 U.S.C. § 57(c)(1).

15

55.     For example, on March 12, 2002, HP's Mark Lamdin and Marilyn Cepuran, an HP Global Business Manager, notified Accenture that HP's influencer fees on the Defense Logistics Agency (DLA) Contract would have to be disclosed because "federal law requires such disclosure." Despite this knowledge and intent, neither HP nor Accenture disclosed the influencer fees related to the DLA.

56.     HP further violated the False Claims Act by expressly or impliedly making false statements, records or certifications in response to the Government requests for proposals that it was compliance and would continue to comply with the Anti-Kickback Act.

57.     HP's payment of Alliance Benefits in the form of influencer fees and NBO further violated the FCA because the claims submitted by HP were inflated. These claims by HP that were submitted directly or indirectly to the United States Government were inflated because they included the amounts of the influencer fees and the NBO.

## CLAIMS

## COUNT I

(VIOLATIONS OF THE FALSE CLAIMS ACT)

58.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 57 above, as if fully set forth herein.

59.     Accordingly, HP has violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a) by:

>       a.      Knowingly presenting or causing to be presented to the United States
>               Government, directly or indirectly, false or fraudulent claims to be paid or
>               approved, directly or indirectly, by the United States Government (31

16

U.S.C. § 3729(a)(1)); and

b.    Knowingly making, using, or causing to be made or used, or presenting false records or statements and/or false certifications to obtain contracts/subcontracts and/or the payment of false or fraudulent claims to be paid or approved by the United States Government (31 U.S.C. § 3729(a)(2));

60.    The United States Government, upon presentation of such claims for payment, whether directly or indirectly, remitted payment despite the false nature of such claims.

61.    Pursuant to 31 U.S.C. § 3729(a), HP is liable to the United States Government for a civil penalty of not less than $5,500, and not more than $11,000 for each violation of the FCA committed by Defendants.

62.    The United States Government has further sustained damages, and will yet sustain damages up to the date of trial in an amount yet to be determined. Pursuant to 31 U.S.C. § 3729(a) HP is liable for three times the amount of all such damages sustained by the United States Government.

## COUNT II

(VIOLATION OF THE ANTI-KICKBACK ACT)

63.    Paragraphs 1 through 62 of this Complaint are hereby realleged and incorporated as though set forth in full herein.

64.    This is a claim against HP under the Anti-Kickback Act.

65.    The arrangements and activities described above in connection with HP's Alliance Benefit payments were knowingly carried out by HP "for the purpose of improperly

17

obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract," 41 U.S.C. §52(2), and thus constituted illegal kickbacks in violation of 41 U.S.C. §53, as well as in violation of HP's contracts with the Government.

66.    By reason of the conduct alleged herein, HP knowingly engaged in conduct prohibited by 41 U.S.C. §53 with respect to kickbacks paid to Alliance Partners by HP on Government contracts and subcontracts.

67.    By reason of the conduct alleged herein, HP knowingly caused, directly or indirectly, the kickbacks to be included in the charges to the United States Government, in violation of 41. U.S.C. §53(3).

68.    Pursuant to section 55(a)(1)(A), the United States is entitled to recover from HP double the amount of the kickbacks plus $10,000 per kickback.

69.    In the alternative, pursuant to section 55(a)(2), the United States is entitled to recover the amount of the kickbacks from HP.

## COUNT III

(BREACH OF CONTRACT)

70.    Paragraphs 1 through 69 of this complaint are realleged and incorporated as though set forth in full herein.

71.    By reason of the actions described above, HP materially breached the United States' contracts by not providing the services for which it was contracted. HP billed in violation of the terms of those contracts, including specifically, the violations of the AKA.

72.    By reason of these breaches, the United States has been damaged.

18

## COUNT IV

(PAYMENT BY MISTAKE)

73.     The United States repeats and realleges each allegation as set forth above in paragraphs 1 through 72.

74.     Defendant HP caused the United States to make payments for HP products and services based upon the United States' mistaken belief that the requirements of its contracts and subcontracts pursuant to which HP was being paid had been met and that the HP contracts were without violations of the AKA. In such circumstances, the payments by the United States to HP was by mistake and not authorized.

75.     As a result of those mistaken payments, the United States has sustained damage.

## COUNT V

(UNJUST ENRICHMENT)

76.     Paragraphs 1-75 are realleged and incorporated as though set forth herein.

77.     By reason of the United States' payments under the its contracts and subcontracts, HP received money to which it was not entitled and has thereby been unjustly enriched in an undetermined amount.

## PRAYER

WHEREFORE, Plaintiff, United States, prays for judgment against Defendant HP as follows:

A.      On Count I, pursuant to the FCA, judgment against HP for triple damages sustained by the United States, plus civil penalties as are allowable by law, and all other proper relief.

19

B.   On Count II, pursuant to the AKA, judgement against HP for double the amount
     of the prohibited kickbacks, plus civil penalties as are allowable by law in the
     amount of $10,000 per violation, pre-judgment and post- judgment interest, and
     costs, or in the alternative, pursuant to 41 U.S.C. §55(a)(2), the amount of the
     prohibited kickbacks, plus pre-judgment and post- judgment interest, and costs.

C.   On Counts III-V, judgment against HP for the damages sustained, all profits
     earned by virtue of the wrongdoing, plus pre-judgment and post- judgment
     interest, and costs.

D.   Such other and further relief as is just and proper.


     THE UNITED STATES DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO
TRIABLE.

                              UNITED STATES OF AMERICA

                              By its attorneys,

                              PETER D. KEISLER
                              Assistant Attorney General


                              _____
                              TIM GRIFFIN
                              United States Attorney
                              Eastern District of Arkansas

                              DAN STRIPLING (Bar No. 74142)
                              Assistant U.S. Attorney
                              P.O. Box 1229
                              Little Rock, Arkansas  72203
                              (501) 340-2600


                                      20

JOYCE R. BRANDA
PATRICIA DAVIS
DONALD J. WILLIAMSON
Attorneys, Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, DC  20044
Tel:  (202) 514-7900

Dated: April 12, 2007